UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION

| | | |
|---|---|---|
| VIP STARNETWORK, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:22-cv-00543-LF-JHR |
| | § | |
| RPE PRODUCTIONS, LLC, | § | |
| | § | |
| Defendant. | § | |

<u>DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS</u>

Defendant RPE Productions, LLC ("RPE") files this Answer, Affirmative Defenses, and Counterclaims and, in support thereof, would respectfully show the Court as follows:

**ANSWER**

RPE generally denies all of the allegations contained within Plaintiff VIP StarNetwork, LLC's ("VIP") Complaint for Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; and Tortious Interference with Prospective Contract (the "Complaint") except those specifically admitted in this Answer. RPE responds to the allegations and legal conclusions in the Complaint paragraph by paragraph as follows:

**Parties and Definitions**

1.      RPE lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 1 of the Complaint, and therefore, denies the same.

2.      RPE admits that it is a Delaware Limited Liability Company and that it provided production services in connection with the filming and production of the Amazon Prime series *Outer Range*. RPE denies the remaining allegations in Paragraph 2 of the Complaint.

3.      RPE admits that it entered into an MSA with VIP, effective September 24, 2020,

which document speaks for itself.  RPE denies the remaining allegations in Paragraph 3 of the Complaint.

4.    RPE admits that VIP was to provide certain services to RPE under the MSA, which document speaks for itself.  RPE denies the remaining allegations in Paragraph 4 of the Complaint.

5.    RPE admits that *Outer Range* is a television series produced by Amazon Studios and Plan B Entertainment and that it was filmed at I-25 Studios in Albuquerque, New Mexico, among other locations in New Mexico.  RPE denies the remaining allegations in Paragraph 5 of the Complaint.

**Jurisdiction and Venue**

6.    RPE submits that the allegations set forth in Paragraph 6 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

7.    RPE submits that the allegations set forth in Paragraph 7 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

**Nature of the Case**

8.    RPE submits that the allegations set forth in Paragraph 8 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

9.    RPE submits that the allegations set forth in Paragraph 9 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

10.    RPE submits that the allegations set forth in Paragraph 10 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

11.    RPE submits that the allegations set forth in Paragraph 11 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

12.    RPE submits that the allegations set forth in Paragraph 12 of the Complaint

constitute legal conclusions, for which no response is required, and therefore, denies the same.

**Facts Relevant to Claims for Relief**
**VIP Provides Services to RPE and is Improperly Terminated**

13.    RPE admits that the mobile lab was set up at I-25 studios and that VIP provided testing in Albuquerque, Las Vegas, and Buena Vista.  RPE denies the remaining allegations in Paragraph 13 of the Complaint.

14.    RPE admits that the rights of RPE and VIP were outlined and described in the MSA, which document speaks for itself.  RPE denies the remaining allegations in Paragraph 14 of the Complaint.

15.    RPE admits that McNair sent an email on February 27, 2021 terminating the MSA, which email speaks for itself.  RPE denies the remaining allegations in Paragraph 15 of the Complaint.

16.    RPE denies the allegations set forth in Paragraph 16 of the Complaint.

17.    RPE lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 17 of the Complaint, and therefore, denies the same.

18.    RPE lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 18 of the Complaint, and therefore, denies the same.

19.    RPE lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 19 of the Complaint, and therefore, denies the same.

20.    RPE submits that the allegations set forth in Paragraph 20 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

**First Claim for Relief**
**(Breach of Contract)**

21.    Paragraph 21 of the Complaint does not contain a factual allegation to which a

response is required, and therefore, RPE denies the same.

22.    RPE submits that the allegations set forth in Paragraph 22 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

23.    RPE denies the allegations set forth in Paragraph 23 of the Complaint.

24.    RPE denies the allegations set forth in Paragraph 24 of the Complaint.

25.    RPE denies the allegations set forth in Paragraph 25 of the Complaint.

26.    RPE submits that the allegations set forth in Paragraph 26 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

**Second Claim for Relief**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

27.    Paragraph 27 of the Complaint does not contain a factual allegation to which a response is required, and therefore, RPE denies the same.

28.    RPE submits that the allegations set forth in Paragraph 28 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

29.    RPE denies the allegations set forth in Paragraph 29 of the Complaint.

30.    RPE submits that the allegations set forth in Paragraph 30 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

31.    RPE submits that the allegations set forth in Paragraph 31 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

32.    RPE submits that the allegations set forth in Paragraph 32 of the Complaint constitute legal conclusions, for which no response is required, and therefore, denies the same.

**Third Claim for Relief**
**(Tortious Interference with Prospective Contract)**

33.    Paragraph 33 of the Complaint does not contain a factual allegation to which a

response is required, and therefore, RPE denies the same.

34.     RPE denies the allegations set forth in Paragraph 34 of the Complaint.

35.     RPE denies the allegations set forth in Paragraph 35 of the Complaint.

36.     RPE denies the allegations set forth in Paragraph 36 of the Complaint.

37.     RPE denies the allegations set forth in Paragraph 37 of the Complaint.

38.     RPE denies the allegations set forth in Paragraph 38 of the Complaint.

39.     RPE denies the allegations set forth in Paragraph 39 of the Complaint.

VIP's prayer does not contain any factual allegations to which a response is required, and therefore, RPE denies the same. However, if the prayer is construed to contain factual allegations, RPE denies each and every allegation therein.

## AFFIRMATIVE DEFENSES

RPE asserts the following affirmative and other defenses:

1.     VIP's claims are barred, in whole or in part, by VIP's prior material breach of the contract that is the subject of this lawsuit.

2.     VIP's claims are barred, in whole or in part, because VIP has failed to mitigate damages.

3.     VIP's claims are barred, in whole or in part, because RPE is entitled to offsets that reduce or entirely eliminate VIP's claims.

4.     VIP's claims are barred, in whole or in part, by VIP's repudiation of the contract.

5.     VIP's claims are barred, in whole or in part, by the doctrine of waiver.

6.     VIP's claims are barred, in whole or in part, by the defense of impossibility and/or impracticability.

7.     VIP's claims are barred, in whole or in part, by the doctrine of ratification.

8.      VIP's claims are barred, in whole or in part, by the applicable statute of limitations.

9.      VIP's claims are barred, in whole or in part, by the defense of payment.

10.     VIP's claims are barred, in whole or in part, by the doctrine of laches.

11.     VIP's claims are barred, in whole or in part, by the doctrine of novation.

12.     VIP's claims are barred, in whole or in part, by the defense of fraud.  Specifically, and as explained in detail in the Counterclaims below, VIP falsely certified *Outer Range* crew members as having negative results (or "Cleared to Work") even though their testing was never done, not yet done, or done improperly; falsely misrepresented that it was providing RPE a mobile lab on a full-time basis when in fact it was using RPE's advance payments to fund the performance of testing for two other television shows and a local academy out of RPE's lab; falsely misrepresented to RPE that certain persons were "Cleared to Work," when in fact their test samples where incompatible with VIP's lab machines and the tests could not be run; falsely misrepresented to RPE that certain "super stat" tests were underway when in fact nobody was present in the lab to run the tests; and changed the dates on test kits to make certain tests appear timely.

13.     VIP's claims are barred, in whole or in part, by the defense of failure of consideration.

14.     VIP's claims are barred, in whole or in part, by the doctrine of estoppel.

15.     VIP's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

16.     VIP's tortious interference claim is barred, in whole or in part, by its own acts or omissions that caused VIP's alleged injury.

17.     VIP's tortious interference claim is barred, in whole or in part, by the defense of privilege.

18.    VIP's tortious interference claim is barred, in whole or in part, by the defense of justification.

19.    RPE expressly reserves the right to amend and/or supplement this answer by way of adding any affirmative defenses as additional facts are obtained through further investigation and discovery.

## COUNTERCLAIMS

RPE hereby complains of VIP as follows:

### Parties

1.    RPE is a Delaware limited liability company whose sole member is a Delaware corporation that has its principal place of business in Vancouver, Canada.

2.    VIP is a New Mexico limited liability company whose sole member is Johonniuss Chemweno, who is a citizen of and domiciled in New Mexico.

### Jurisdiction and Venue

3.    This Court has subject matter jurisdiction because this lawsuit involves parties of diverse citizenship and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a).  This Court has personal jurisdiction over VIP because it is a resident of New Mexico.

4.    Venue is proper in the United States District Court for the District of New Mexico, Albuquerque Division, because it is the judicial district in which VIP resides.  28 U.S.C. § 1391(b)(1).

### Facts

5.    RPE provides production services in connection with the filming and production of the Amazon Prime series *Outer Range*, which was filmed in New Mexico.  Due to the COVID-19 global pandemic, RPE sought a vendor to provide, among other things, on-site COVID testing for

the *Outer Range* cast and crew (the "Set Members") during the filming of the first season.  To that end, RPE and VIP entered a Master Services Agreement (the "MSA") whereby VIP agreed to provide such services, as described below.

**A.    The Terms of the MSA.**

6.    Pursuant to the MSA, VIP expressly agreed to provide the following services to RPE:

- COVID-19 diagnostic testing, which expressly included "onsite COVID-19 molecular PCR testing services, test kits, specimen collection, specimen packaging and shipping/logistics, results reporting for Set Members, as necessary and as requested by [RPE] and/or its designees";

- Physicals performed by physicians for the Set Members, as needed;

- On-going safety reviews by a COVID Compliance Officer "based on State and Federal Guidelines and all Covid-19 safety guidelines";

- Availability, as needed, of RPE's "contracted providers, medical staff, nurses and any other medical staff, employee or health safety supervisor . . . to render medical care and treatment or diagnostic tests to Set Members who become ill or injured";

- A mobile healthcare clinic "on a full-time basis" for the duration of the production of *Outer Range*; and

- Personal protective equipment as requested.

7.    Importantly, VIP expressly agreed to perform all of these services "in a timely fashion and in compliance with all applicable federal, state and local laws and regulations, including, without limitation, the Health Insurance Portability and Accountability Act of 1996 ('HIPAA'), and 29 C.F.R. 1910 [the Occupational Safety and Health Standards promulgated by OSHA], and in accordance with standard medical practices and protocols."

8.    VIP agreed to provide "all equipment and supplies necessary" for the services above "at no additional cost to [RPE]."  VIP further agreed not to assign the MSA, "nor the rights and

obligations created under it," without the prior written consent of RPE.  VIP agreed to hold in confidence RPE's confidential and proprietary information, which was defined to include all information reasonably understood to be confidential, including information pertaining to Set Members.

9.      In order to fund VIP's operations and ensure timely COVID testing for the *Outer Range* production, RPE agreed to pay to VIP in advance 50% of the estimated monthly invoice amount for the following month.

10.     The MSA provided that either party could terminate the agreement at any time, with or without cause, by giving thirty days' advance written notice to the other party.  If RPE terminated the MSA "for any reason other than [VIP's] uncured material breach," VIP agreed that any amounts advanced by RPE that were unused shall be credited to Amazon Studios "under its overall deal with Amazon Studios" (such "overall deal" between VIP and Amazon never materialized, at least in part, due to VIP's wrongful acts described herein).  If RPE terminated the MSA "for [VIP's] uncured material breach," VIP expressly agreed that any amounts advanced by RPE that were unused shall be immediately reimbursed to RPE.  Thus, if RPE terminated the MSA, regardless of whether it was for a material breach or any other reason, VIP expressly agreed that it would not be entitled to hold on to any advanced payment from RPE that went unused.

11.     Under Section 17 of the MSA, the prevailing party in litigation shall be entitled to court costs, expenses of litigation, and reasonable attorneys' fees incurred.

**B.      VIP Provides Substandard Work, Falsely Certifies COVID Test Results, and Breaches the MSA and Applicable Law in Numerous Ways.**

12.     Throughout the term of the MSA, VIP provided substandard work and falsely represented test results to RPE, which violated not only the terms of the MSA but also HIPAA, OSHA standards, and standard medical practices and protocols, putting Set Members at risk and

necessitating VIP's immediate removal from the production of *Outer Range*.

13.     At the outset, despite its agreement to provide a mobile healthcare clinic on a full-time basis for the duration of filming, VIP substantially delayed the installation of the mobile healthcare clinic, resulting in a lack of the on-site lab for the start of filming.

14.     On October 31, 2020, VIP mailed one of the *Outer Range* actors a **used** COVID test, rather than a new test kit for specimen collection.

15.     On November 9, 2020, VIP failed to timely return three Set Members' test results, resulting in substantial delay to RPE and the production.

16.     On November 16, 2020, VIP instructed its nurses to leave the on-site mobile lab at approximately 11:00 a.m., leaving *Outer Range* without necessary on-site testing for the remainder of that day.  On the same day, VIP certified several Set Members as having negative results (or "Cleared to Work") even though their testing was underway and not yet complete.

17.     On November 17, 2020, VIP ran out of reagent (the fluid needed for COVID test kits) and was unable to timely complete testing that day, resulting in substantial delay to RPE and *Outer Range*.  VIP promised RPE that this would be the last time it would run out of the reagent necessary for testing.

18.     On November 20, 2020, VIP substantially delayed re-running invalid test results that were received the prior day.  On the same day, VIP emailed RPE another television show's test results, indicating that VIP was running COVID testing for this other show out of the same lab that RPE contracted to use on a full-time basis and paid for in advance in order to ensure adequate supplies for efficient testing on *Outer Range*.  Since this time, RPE has learned that VIP was in fact performing tests for two other television shows as well as a local academy located in Albuquerque, which led to the staff and supply shortages that caused material delays to the production of *Outer*

*Range*.

19.    On December 10, 2020, VIP again ran out of reagent, resulting in a delay of an entire day in getting results, and causing substantial loss to the production of *Outer Range*.  On or about the same day, VIP improperly collected specimens from two prominent actors, failing to collect the samples in kits that were compatible with its lab machines.  Instead of admitting to the error, Tim Drake, VIP's on-set lab director, attempted to convince two separate VIP nurses to "switch out" or "transfer" the swabs to compatible test kits, even though it was well known to everyone involved that such a transfer would not work on VIP's lab machines and would be unethical and against medical procedure.  Both nurses refused to run the test.  Despite not running the test at all, VIP certified both actors as "Cleared to Work," putting both actors and everyone on set at risk the following day.

20.    On January 25, 2021 at around 6:45 a.m., RPE asked VIP staff whether certain "super stat" (urgent tests) were being run.  Tim Drake told VIP staff to inform RPE that the tests were indeed being run even though he knew there was nobody present in the lab at the time to run the tests.

21.    On February 16, 2021, VIP again ran out of reagent due to running testing for multiple television shows and a local academy out of the lab that RPE paid to have exclusive access to.

22.    On February 18, 2021, RPE requested a "super stat" test at 7:00 a.m. the following day for an important member of the crew.  The following day VIP cleared this person to work even though there was nobody present in the lab at the time, indicating that VIP never ran the test.

23.    On February 19, 2021, VIP was still out of reagent to run testing for *Outer Range*. Tim Drake emailed an RPE representative at 12:58 p.m. stating that VIP has "utilized some

additional resources to get caught up," indicating that VIP was outsourcing testing to a third party despite the anti-assignment provision in the MSA.

24.    On information and belief, VIP staff changed dates on COVID test kits to make them appear timely when they were not.

25.    During VIP's tenure running tests for *Outer Range*, the rate of invalid tests was above industry standard.

26.    In addition, VIP's online portal for viewing results malfunctioned numerous times over the term of the MSA, causing further delays to RPE and *Outer Range*.

27.    On February 27, 2021, RPE immediately terminated the MSA in order to replace VIP with a competent vendor that would comply with standard medical practices and protocols and to ensure the safety of Set Members during the production of *Outer Range*, which had been put at risk by VIP's incompetence and complete disregard for applicable COVID protocols.

28.    Despite its obligations to return advance payments that went unused, VIP has failed and refused, and continues to fail and refuse, to return $527,967 in advance funds that RPE paid to VIP for the estimated amount due for the month of March.

29.    VIP's former employees have also filed claims against VIP and its CEO, Johonniuss Chemweno, for retaliatory discharge, which lawsuits are pending in the Second Judicial District Court of Bernalillo County, New Mexico.[1]  The pleadings in these lawsuits, which are open to the public, detail how these former employees personally observed, among other things, (i) Chemweno mailing live COVID specimens without the required biohazardous labeling; (ii) VIP certifying results as negative or "Cleared to Work" even though the testing was either not done or was done improperly, risking exposure of that individual to COVID or risking transmission to others; (iii)

---

[1] These lawsuits bear Case Nos. D-202-CV-202105954; D-202-CV-202106036; D-202-CV-202106114; D-202-CV-202106115; and D-202-CV-202107146.

Chemweno storing live COVID samples in VIP's lunch refrigerator; (iv) Chemweno sending confidential HIPAA protected information via email to third parties not entitled to view such information; (v) VIP sending test samples with patient names on them to the wrong individuals; (vi) VIP sending results to the wrong television show; and (vii) VIP sending an actor a used test kit.

30.     Although extensive, the numerous breaches and violations outlined above are based only on the information readily available to RPE at the time of this filing, and RPE anticipates that that it will learn of far greater violations through further investigation and discovery in this case.

31.     As a direct result of VIP's wrongful acts, RPE has been significantly harmed.

32.     All conditions precedent to RPE's recovery and VIP's liability have occurred, have been performed, or have been waived.

### Count One: Breach of Contract

33.     The MSA is a valid and enforceable contract by and between RPE and VIP.

34.     RPE performed, tendered performance of, or was excused from performing its contractual obligations under the MSA.

35.     Pursuant to the terms of the MSA, VIP expressly agreed, among other things, to:

- provide COVID-19 diagnostic testing, which expressly included "onsite COVID-19 molecular PCR testing services, test kits, specimen collection, specimen packaging and shipping/logistics, results reporting for Set Members, as necessary and as requested by [RPE] and/or its designees";

- provide availability, as needed, of RPE's "contracted providers, medical staff, nurses and any other medical staff, employee or health safety supervisor . . . to render medical care and treatment or diagnostic tests to Set Members who become ill or injured";

- provide a mobile healthcare clinic "on a full-time basis" for the duration of the production of *Outer Range*;

- perform all services "in a timely fashion and in compliance with all

applicable federal, state and local laws and regulations, including, without limitation, the Health Insurance Portability and Accountability Act of 1996 ('HIPAA'), and 29 C.F.R. 1910 [the Occupational Safety and Health Standards promulgated by OSHA], and in accordance with standard medical practices and protocols";

- provide "all equipment and supplies necessary" for the services;

- refrain from assigning the MSA or any of the rights and obligations thereunder without the prior written consent of RPE;

- hold in confidence RPE's confidential and proprietary information, which was defined to include all information reasonably understood to be confidential, including information pertaining to Set Members; and

- immediately return advance payments if RPE terminated the MSA.

36.    VIP materially breached the MSA by:

- substantially delaying the installation of the mobile healthcare clinic such that the same was not available on a full-time basis for the start of filming;

- mailing an actor a used COVID test, rather than a new test kit for specimen collection;

- failing to timely return test results, causing substantial delays to the production schedule;

- certifying Set Members as having negative results (or "Cleared to Work") even though their testing was never done, not yet done, or done improperly;

- running out of reagent on numerous occasions, causing substantial delay to production;

- instructing nurses to leave the mobile lab at approximately 11:00 a.m., leaving *Outer Range* without necessary on-site testing on a full-time basis as provided under the MSA;

- substantially delaying re-running invalid tests;

- performing tests for two other television shows and a local academy out of the lab RPE paid for and VIP agreed to provide to RPE on a full-time basis, leading to supply and staff shortages and substantial delay to production of *Outer Range*;

- misrepresenting to RPE that certain persons were "Cleared to Work," when

in fact their test samples where incompatible with VIP's lab machines and the tests could not be run;

- misrepresenting to RPE that certain "super stat" tests were underway when in fact nobody was present in the lab to run the tests;

- outsourcing COVID testing to a third party without RPE's prior written consent;

- changing dates on test kits to make certain tests appear timely;

- performing substandard testing, resulting in an invalid rate well above industry standard;

- mailing live samples without biohazardous labeling;

- failing and refusing to return $527,967 in advance funds for the estimated services for March 2021;

- storing live COVID samples in the company lunch refrigerator; and

- sending HIPAA-protected information to third parties.

37.    As a direct and proximate result of VIP's material breaches of the MSA, RPE has sustained damages in an amount to be determined at trial.

**Count Two: Breach of Covenant of Good Faith and Fair Dealing**

38.    A covenant of good faith and fair dealing is implied in the MSA between RPE and VIP.

39.    VIP acted in bad faith and wrongfully and intentionally used the MSA to RPE's detriment.  Pursuant to the MSA, RPE agreed to, and did, pay to VIP in advance 50% of the estimated monthly invoice amount for the following month during filming of *Outer Range*.  VIP expressly agreed to provide a mobile lab for COVID testing to RPE and *Outer Range* on a full-time basis.  VIP promised that it was using the lab only for the production of *Outer Range*.  VIP acted in bad faith and wrongfully and intentionally to RPE's detriment by using RPE's advanced monies to fund the performance of COVID testing for two other television shows and a local academy in

the lab it contractually agreed to provide to RPE on a full-time basis.  VIP's actions led to supply and staff shortages, thereby causing substantial delays and costs to RPE and *Outer Range* and denying RPE the benefits of the MSA.

40.    VIP also acted in bad faith when it certified Set Members as having negative results (or "Cleared to Work") even though their testing was never done, not yet done, or done improperly. VIP's actions put Set Members at risk of contracting COVID and denied RPE the benefits of the MSA, which provided that VIP would perform all services "in a timely fashion and in compliance with all applicable federal, state and local laws and regulations, including, without limitation, the Health Insurance Portability and Accountability Act of 1996 ('HIPAA'), and 29 C.F.R. 1910 [the Occupational Safety and Health Standards promulgated by OSHA], and in accordance with standard medical practices and protocols."

41.    VIP's conduct was malicious, willful, reckless, wanton, fraudulent, in bad faith, and resulted in substantial harm to RPE.  As a direct and proximate result of VIP's breaches of the covenant of good faith and fair dealing, RPE has sustained damages in an amount to be determined at trial and is entitled to punitive damages under applicable law.

### Count Three: Fraud

42.    During VIP's work on *Outer Range*, it made several misrepresentations of fact that were not true.

43.    Specifically, on November 16, 2020, VIP certified several Set Members as having negative results (or "Cleared to Work") even though VIP had not yet completed testing for these individuals.

44.    Throughout its time on the project, VIP falsely misrepresented to RPE that it was providing RPE a mobile lab on a full-time basis when in fact it was using RPE's advance payments

to fund the performance of testing for two other television shows and a local academy out of RPE's lab.

45.    On December 10, 2020, VIP improperly collected specimens from two prominent actors, failing to collect the samples in kits that were compatible with its lab machines.  Instead of admitting to the error, Tim Drake, VIP's on-set lab director, attempted to convince two separate VIP nurses to "switch out" or "transfer" the swabs to compatible test kits, even though it was well known to everyone involved that such a transfer would not work on VIP's lab machines and would be unethical and against medical procedure.  Both nurses refused to run the test.  Despite not running the test at all, VIP certified both actors as "Cleared to Work," putting both actors and everyone on set at risk the following day.

46.    On January 25, 2021 at around 6:45 a.m., RPE asked VIP staff whether certain "super stat" (urgent tests) were being run.  Tim Drake told VIP staff to inform RPE that the tests were indeed being run even though he knew there was nobody present in the lab at the time to run the tests.

47.    On February 18, 2021, RPE requested a "super stat" test at 7:00 a.m. the following day for an important member of the crew.  The following day VIP cleared this person to work even though there was nobody present in the lab at the time, indicating that VIP never ran the test.

48.    As referenced above, the pleadings in the lawsuits by VIP's former employees against VIP confirm many of these facts, by detailing how these former employees personally observed, among other things, VIP certifying results as negative or "Cleared to Work" even though the testing was either not done or was done improperly, risking exposure of that individual to COVID and risking transmission to others.

49.    Through further investigation and discovery, including the depositions of former

VIP employees, RPE anticipates that it will continue to learn of fraudulent misrepresentations in addition to those detailed herein.

50.     VIP made these misrepresentations with full knowledge of their falsity and, at the very least, with recklessness as to the truth or falsity of the information.  Specifically, when VIP certified several Set Members as having negative results (or "Cleared to Work"), VIP knew this information was false and could not be true because VIP had not even completed testing for these individuals.  On January 25, 2021, when VIP represented to RPE that certain "super stat" tests were being run, VIP knew this information was false and could not be true because VIP knew that nobody was present in the lab at the time to run the tests.  On February 19, 2021, when VIP cleared an important member of the crew for work, VIP knew this information was false and could not be true because, again, nobody was present in the lab to run the testing for this person.

51.     In addition, when VIP represented to RPE that it was providing RPE a mobile lab on a full-time basis, VIP knew this information was false because VIP was secretly utilizing RPE's advance payments under the MSA to fund testing for two other television shows and a local academy out of RPE's lab.  When VIP certified two prominent actors as "Cleared to Work" on December 10, 2020, VIP knew this information was false and could not be true because VIP never ran these tests despite Tim Drake's (VIP's lab director) attempts to convince VIP staff to "transfer" these tests to compatible test kits.

52.     VIP made each of these misrepresentations with the intent to deceive RPE and to induce RPE to rely on the misrepresentations.  RPE actually and detrimentally relied on VIP's false representations that certain Set Members tested negative for COVID by allowing those people to work, risking transmission to others on set.  RPE actually and detrimentally relied on VIP's false representation that it was providing a full-time lab to RPE by providing VIP advance payments and

allowing VIP to continue work on *Outer Range*, even though VIP was running other shows out of the lab causing supply and staff shortages and substantial delays to the production of *Outer Range*.

53.     RPE has suffered substantial damages that were proximately caused by its justifiable reliance on these representations, including significant delays in production on *Outer Range*.  In addition, by clearing individuals to work without completing their testing, VIP risked the transmission of COVID to other Set Members and endangered their health and safety.  VIP's conduct was malicious, willful, reckless, wanton, fraudulent, in bad faith, and resulted in substantial harm to RPE.  As such, RPE is entitled to damages in an amount to be determined at trial as well as punitive damages under applicable law.

## Count Four: Negligent Misrepresentation

54.     During the course of its work on *Outer Range*, VIP supplied false information for the guidance of RPE in its business of running production for *Outer Range*.  Specifically, and as detailed above, VIP:

- falsely certified Set Members as having negative results (or "Cleared to Work") even though their testing was never done, not yet done, or done improperly;

- falsely misrepresented that it was providing RPE a mobile lab on a full-time basis when in fact it was using RPE's advance payments to fund the performance of testing for two other television shows and a local academy out of RPE's lab;

- falsely misrepresented to RPE that certain persons were "Cleared to Work," when in fact their test samples where incompatible with VIP's lab machines and the tests could not be run; and

- falsely misrepresented to RPE that certain "super stat" tests were underway when in fact nobody was present in the lab to run the tests.

55.     RPE justifiably relied on these representations by allowing certain Set Members to work when it otherwise would have prevented them from working if RPE knew that their testing

was incomplete or performed improperly.  RPE further relied on VIP's representation that it was providing a full-time lab to RPE by providing VIP advance payments and allowing VIP to continue work on *Outer Range*, even though VIP was running other shows out of the lab causing supply and staff shortages and substantial delays to the production of *Outer Range*.

56.    As detailed above, VIP knew these representations were false when made or, at the very least, made the representations recklessly because VIP had no reasonable ground for believing that the statements were true.  In making the false representations, VIP intended to induce RPE to rely upon the same.

57.    RPE has suffered substantial damages that were proximately caused by its justifiable reliance on these representations, including significant delays in production on *Outer Range*.  In addition, by clearing individuals to work without completing their testing, VIP risked the transmission of COVID to other Set Members and endangered their health and safety.  VIP's conduct was malicious, willful, reckless, wanton, fraudulent, in bad faith, and resulted in substantial harm to RPE.  As such, RPE is entitled to damages in an amount to be determined at trial as well as punitive damages under applicable law.

### Count Five: Violations of the New Mexico Unfair Practices Act

58.    The New Mexico Unfair Practices Act forbids false or misleading oral or written statements in connection with the sale of services.

59.    VIP committed violations of the New Mexico Unfair Practices Act by:

- falsely certifying Set Members as having negative results (or "Cleared to Work") even though their testing was never done, not yet done, or done improperly;

- falsely misrepresenting that it was providing RPE a mobile lab on a full-time basis when in fact it was using RPE's advance payments to fund the performance of testing for two other television shows and a local academy out of RPE's lab;

- falsely misrepresenting to RPE that certain persons were "Cleared to Work," when in fact their test samples where incompatible with VIP's lab machines and the tests could not be run;

- falsely misrepresenting to RPE that certain "super stat" tests were underway when in fact nobody was present in the lab to run the tests; and

- changing dates on test kits to make certain tests appear timely.

60.     As a direct and proximate result of these violations, RPE has sustained damages in an amount to be determined at trial.  Because VIP willfully engaged in the above actions, RPE is entitled to three times its actual damages.

### Attorneys' Fees

61.     RPE is entitled to its costs and attorneys' fees pursuant to the terms of the MSA, N.M. Stat. § 57-12-10(C), and other applicable law.

### PRAYER

**WHEREFORE,** RPE prays that (i) VIP be cited to appear and answer the counterclaims asserted herein; (ii) the Court enter judgment against VIP in an amount to be determined at trial, including punitive damages, all pre-judgment interest, post-judgment interest, costs of court, and attorneys' fees allowed by the MSA and applicable law; (iii) VIP take nothing in its suit and the Court dismiss all of VIP's claims with prejudice; and (iv) the Court grant RPE such other and further relief, whether at law or in equity, to which it may be justly entitled.

Respectfully submitted,

**THE SIMONS FIRM, LLP**

By:  /s/ *Quinn Scott Simons*
Quinn Scott Simons
New Mexico Bar No. 145806
1660A Old Pecos Trail
Santa Fe, New Mexico 87505
(505) 988-5600 (telephone)
(505) 982-0185 (facsimile)
qsimons@simonsfirm.com

-and-

**GREENBERG TRAURIG, LLP**

Gregory J. Casas (admitted *pro hac vice*)
Texas Bar No. 00787213
R. Kent Love (admitted *pro hac vice*)
Texas Bar No. 24102114
300 West 6th Street, Suite 2050
Austin, Texas 78701
(512) 320-7200 (telephone)
(512) 320-7210 (facsimile)
casasg@gtlaw.com
lovek@gtlaw.com

***Attorneys for RPE Productions, LLC***

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 1, 2022, a true and correct copy of the foregoing was served, upon filing, via the Court's CM/ECF system upon all parties requesting electronic notification in this case.

/s/ *Quinn Scott Simons*
Quinn Scott Simons